This is case number 5-2-18-0234, United City of Yorkville v. TRG Venture Two, LLC Ben and Patty in Fidelity Imposit Company in Maryland, Pennsylvania. Reporter in defense. Arguing on behalf of the company in United City of Yorkville, Mr. Thomas G. Gardner. Arguing on behalf of the company in United City of Yorkville, Mr. Cornelius F. Reardon. Arguing on behalf of the defense, Mr. John R. Roney. Arguing on behalf of the company in United City of Yorkville, Mr. Adam C. Tuesley. Arguing on behalf of the company in United City of Yorkville, Mr. Scott L. Powell. The City of Yorkville has filed a motion for leave to distinguish additional authority of the Doyle case. Is there any objection from the appellee? No. Okay. Very well, Mr. Gardner. Thank you. Please speak loudly enough so that the recorder can pick up your remarks. And pay attention to the time signal if additional time is necessary. All right. Very good. Thank you. Justices, this is a case that's appealed from the granting of a motion to dismiss. The 2619 motion filed by William Ryan Holmes and the 2615 filed by TRG. I think it's essential to understand the background of the situation and the timing that goes into it kind of historically here. We've got a tract of land that is originally purchased by a developer named Kimball Hills. Kimball Hills is a national developer. And they entered into an annexation agreement with Yorkville. And that annexation agreement provided that the developer had the responsibility to provide public improvements. And it had the responsibility or that obligation ran with the land. It's a covenant that ran with the land. We're familiar with the facts and the language. What's confusing in the record, how many total lots are there in this subdivision? Judge, initially I believe there were 251 or so. And of those total lots, there were 86 lots that William Ryan Holmes purchased and 71 lots that TRG purchased. But there are other additional lots besides those lots, correct? There are. So some other developers that we don't know who developed the rest of those lots. I think it was all developed. It may have been by Kimball Hill. I don't have all the details about all the prior development that had gone on. I do know that this development was not a fully sold development. It suffered from the Great Recession. And the complaints reference units one and four. How many total units were there? Actually, there were this case of vows four units. It's one, two, and four. There was an initial case that was filed relating to one and two. And then four was the following unit. Three was never developed. What kind of interest did William Ryan and TRG purchase? Were they single lots or were they big areas with common areas? They bought an entire parcel, basically. They bought those lots. Was it a single area? I think that the grouping was together for the last they purchased themselves. I can't tell you about the exact lots and where they were. And the complaint alleged that they failed to complete the public improvements, but it doesn't specify what are the public improvements that they did not complete. Oh, they did not complete. There was roadway was put in. It was not finished. So, for example, there would be curb and gutter, but then the road would not be down below. And what caused the excitement among those who purchased the property and among the community as a whole is that these roads would be very bumpy. And as freeze of thought occurred, you'd have the roads get worse and worse as these years go by. And we're 10 years into this since the Kimball Hill bankruptcy in this case. So the residents were upset about that problem. The landscaping wasn't done. There are a variety of different things. We have a punch list that was prepared by the village engineer. William Ryan claims at page 16 of his brief that you're interpreting the annexation agreement to mean that a purchaser who buys even one empty lot in the subdivision would be responsible for completing all the public improvements. Can you comment on that? We're absolutely not containing that. And, in fact, Doyle, which you filed this motion to clarify or explain what Doyle stands for, would indicate that just the opposite is true, correct? Yes. I was very surprised that that case was cited. It seems that the Doyle case supports our reading of things. And, actually, if you look at the public policy of Illinois that's set forth in the statute, 65 ILCS 5-11-15.14, you have a public policy that says that successors are responsible under annexation agreements, and you have an annexation agreement that accepts the single lot owners. And that's what you see in every annexation agreement. It's not reasonable to have a single purchaser who buys for residential purposes to be on the hook for public improvements. Well, is it a successor owner or a successor developer who is responsible? The successor developer is responsible. And based on what authority? Based on the language of the annexation agreement in this case. And, in fact, in our case, the annexation agreement, paragraph 18, says that it binds successor developers. Paragraph 19 says development obligations are imposed on developers and future developers. Paragraph 22 says that it's binding upon developers and successors. So it's clear in the annexation agreement that that's who it's to be binding upon, developers. Now, they've made arguments that they're not developers. It's hard to figure that out when you're buying 86 lots in one case and 71 lots in another case. If that's not a developer, I don't know what a developer is. Well, what if they sell individual lots? What if I walked in the door and said I'd like to buy lot 86? And would I then be the developer? No, you wouldn't. If I'm going to build a house? If you are buying a house, we have the exception in the annexation agreement to deal with exactly that circumstance. You can buy the house with the understanding that you will take the responsibility to improve that particular lot if the public improvements already haven't been completed correctly. You could do that, yes. Sure. And if you have enough money, you could do it. I suppose. It could be anywhere from a few thousand dollars to $50,000 or $100,000, depending on the configuration and what's necessary in order to improve a lot. That's exactly right, yeah. Are there any provisions of the municipal code that are relevant here and support your position? I think the only provision in the municipal code, you're talking about the Yorkville Municipal Code? Yes. I don't know that there's a provision that we cite here. We generally, as a municipality, rely upon annexation agreements in this circumstance. All right. Well, does 11-15.1-4 of the municipal code indicate an annexation agreement binds successor owners and creates privity of contract for non-signatories? One moment, Judge. I have my summary of the statute, but I don't have a statute in front of me. I'm sure it will get addressed. Okay. Thank you, Your Honor. So I think the provisions are made to protect the single lot owner, and the whole purpose of the annexation agreement is to be into a position in which the developers have to do things that would protect the community at large and protect the individual lot owner who buys. Now, if you look at the practical aspect of this situation, what you have is an annexation agreement that's recorded. It's of record. The developers know about that annexation agreement before they buy, and in this case, what happens? Most developers look at the agreement. They come to the municipality. They say, We have these obligations. How can we deal with these obligations? In this case, William Ryan Holmes says, Well, we're not going to talk to the city of Yorkville. Instead, we're going to contract with Kimball Hill Homes. It makes sense they would think that way because at the time, in 2003, we were in the real estate boom. So they thought, This is good enough for us. They never talked to the village. Now, what happens with TRG? They hit things in the bust. They buy the property at the time that Kimball Hill is going bankrupt. Odie is going bankrupt. Other major developers are going bankrupt. They're buying things on the cheap. Do they come to the village with the annexation agreement? No. What they do is they say, We're buying this on the cheap. We're going to take our risk. We took this risk in other cases that this court has dealt with, and we're going to take our chances. And I would suggest one other thing. As part of that calculation, as a business calculation. This is consistent with their business model. Yes. Their business model is, We buy land. You can sue us. Go ahead, sue us. We'll take the delay in court. We won't take action. That's part of our business model, and it's a whole lot cheaper than spending millions of dollars on infrastructure in the areas that we build in. What does the language in the annexation agreement mean that the obligation of the duties and owners and developer here under shall be deemed transferred to a purchaser, and I'm skipping some language here, unless otherwise expressly agreed in writing by such a purchaser? What does that mean? Well, this is the exception language here, Judge, and in our brief we mentioned how it relates here. The word purchaser is we're dealing with the purchaser of an empty lot that who acquires the same for residential occupation. We're setting out that obligation. The foregoing portion is just saying the developers have the continuing obligation. And who you're referring to, a person, correct? Yes. Who is the purchaser? To live in the home. Yes. As opposed to develop the home. That is correct. Well, what if there's no home there? I'm going to just buy a lot from one of the two, William Ryan or TRG, and I'm going to build my own house. Am I still going to be accepted here? Yes, because it says that it reads the purchaser who acquires the same for residential occupation, and that applies to empty lots as well. Right. That's consistent with the intent of the annexation agreement and the other provisions and the public policy of Illinois. Thank you very much. Mr. Reardon. Good morning, Justices. My name is Cornelius Reardon, and I represent Fidelity and Deposit Company of Maryland in Appeal 0245. This case comes, as far as fidelity is concerned, comes before the court on all fours with the city of Elgin case. In this case, William Ryan Holmes filed a 2615 motion attacking F&D's second amended third-party complaint, just as TRG had done in Elgin. The facts are almost the same. We have a recorded annexation agreement that constitutes a running with the land, a covenant running with the land. There are three provisions in the annexation agreement just referred to in your discussion with Mr. Gardner, paragraphs 18, 19, and 22b, which embody successor liability provisions. William Ryan Holmes, like TRG in Elgin, acquired lots in the subdivision through warranty deed. The warranty deed accepted was the covenants, conditions, restrictions, easements of records, something we see in pretty much every warranty deed that's recorded. When the TRG and Ryan got involved in this subdivision, did they in any way contact Fidelity to get additional bond, talk to Fidelity about the existence of bonds? Did they, or sure it is, did they do anything? Yorkville said they didn't talk to them. Did they talk to them? They did not talk to us either, Justice. Well, is that the reason that Fidelity didn't become a surety for them? I mean, didn't Fidelity's obligation once KH, since they were successors to KH, didn't Fidelity still have that obligation to serve as a surety? And if not, why not? No, we're not denying that we still have the surety obligation. Okay. We're saying, just like we did in the Elgin case, that because of the successor liability provisions, William Ryan Homes acquired the property, subject to the covenant running with the land, which imposed obligations upon them to complete the improvements. They became the primary obligor. We became the secondary obligor. And I might note, in reference to your question, Justice Burkett, when these properties were bought, we're not talking about a situation where none of the improvements had been done. I'm going to estimate, and I've been dealing with this for 10 years, over 60%, if not more, of the improvements had been installed. And what had not been installed were curbs and the final lift on the streets. I'm not sure if you're familiar with that, but asphalt has three lifts or three phases. The final lift is what you see on the top of the streets. Those weren't put in, which caused the asphalt below it to decay over time because it wasn't covered. There was some landscaping that hadn't been done and things of that nature. All the sewer lines had been put in. All the grading had been done. So it's not a situation where we're asking them to put in the entire improvements. Secondly, I don't think it came out, but subsequent to the filing of the Second Amendment third-party complaint, we did settle with the city of Yorkville, just like we did in Elgin. So that rendered moot the creativity and exoneration claims. And all we're looking for is a review of the claims for reimbursement, just like in Elgin. And the reason I bring up the 2615 motion, that's important because William Ryan Holmes, like TRG did, sought dismissal not based on the content of the Second Amendment third-party complaint, but upon matters outside the four corners of the complaint. In particular, they're raising a lot purchase agreement, which they brought before the trial court in their reply in support of their 2615 motion. So they're bringing in matters outside the record, just like TRG did. And in Elgin, the court said, we can't go there unless it appears in the four corners of the complaint. In Elgin, it was a lack of necessary parties defense. But the court said, unless it appears in the complaint, we can't comment on that. You may raise that in the trial court when the case goes back down. And I would submit the same is true here. So that in respect to the city of Elgin controls this case, if I might just finish for a second, based upon the facts, if you look at the facts in the complaint, the counterclaim in Elgin and our complaint here, you'll see they're virtually identical. Thank you very much. I do have one question. Yes. Mr. Gardner indicated that this appears to be the modus operandi of these two companies. Well, having read Montgomery and Elgin and now your case, I'm a little confused which happened where. But are the two appellees here raising the issue that the improvements are done in this particular case, or was that in a previous case? I don't think they're raising that argument here. Okay. Thank you. May it please the Court. I'm Scott Howey, and I represent the defendant appellee, TRG Venture II, LLC. I was struck by something that Mr. Gardner said during his argument this morning, and I think it could be the headline for mine. Developers know about the annexation agreement before they buy. That's a critical thing to understand, that when developers are purchasing, a property that has been annexed in the way that these properties had been, they are aware of what that annexation provides, and they rely upon what it says. In this case. Well, doesn't the deed that secured the properties contain language and general information that this lot A, B, C, are bound by the covenants and restrictions for this subdivision? Well, with respect to what the developer is looking to, I think Mr. Gardner put it best, that it is the annexation agreement that they're looking to when they purchase large tracts, as in this case, both TRG purchasing its 71 lots and William Ryan Homes purchasing 86 out of the total 251. They are looking to what the annexation agreement provides. And in this case, if Yorkville intended to enforce the understanding that it states today of what the annexation agreement required, if it was to enforce against purchasers of all empty lots, regardless of residential plans, or against purchasers of substantially less than the entire property, as that term is defined by the annexation agreement, then it needed to be an unambiguous model of clarity. And that is especially so if it was expecting that partial purchasers were to be expected to be responsible for public improvements to the entire subdivision, including substantial portions. Where is the ambiguity? The ambiguity is in paragraph 22 of the exception. That paragraph states, and Your Honor quoted a large portion of it, the portion that you admitted you were leaving out is the ambiguity. It states that it's part of paragraph 22B. The copy I have is from page 2161 of the record. There are a few other copies. But it refers to successors in the signs and to what obligations are expected to be undertaken by successor owners. It states that the obligations of the original owners do pass. And that is with respect to the property, which is a separate issue as to what the property means. I will get to that. So with respect to the ambiguity here, it states that there is an exception to that succession of obligation. And that is that the obligations and duties of the owners and developer here under shall not be deemed transferred to or assumed by any purchaser of an empty lot or a lot improved with a dwelling unit who acquires the same for residential occupation unless otherwise expressly agreed to in writing by each purchaser. That language can reasonably be interpreted more than one way, and that's giving credit to Yorkville's understanding of it. Yorkville's elaborate effort to explain its understanding as applying to only certain purchasers of empty lots demonstrates that the agreement is far from unambiguous, and it is no model of clarity. Yorkville? Don't we have to look at these agreements generally to avoid the absurd? And why would that paragraph and those words that I left out because I wanted to ask another question but now addressing your issue, why would I, going into that subdivision, be required to do all of the things that had not been done by Kimball prior to the bankruptcy? I'm not sure that I follow your question. We maintain that you would not, in fact, and that TRG and William Bryan would not be required to. Now why would I, a purchaser of one of the lots that Kimball had sold to me, and I built my house, why would I be responsible to complete the entire subdivision improvement? As in your prior hypothetical? Correct. Of course. In that situation, you would not. Why not? It's the same language. But the language refers to, the way that Yorkville would like you to interpret that language is to say that if you purchase an empty lot for residential purposes, then you would not be obligated. And I don't think there's any dispute that that would be the case. I think a better question, and one that's more tailored to the facts of this case, is what if you were purchasing a single lot for the purpose of developing it and not for residential occupations? And in those circumstances, under the Yorkville interpretation of this language, you would, in fact, as a purchaser of an empty lot, not intended for your own residential occupation, you would, in fact, under Yorkville's understanding. Those, well, maybe we don't have that information, but those lots were not, they were zoned for residential, were they not? Yes, they were. Well, then how can I develop it in something other than a residential property? You could develop it for something other than your own residential property. And I think the issue here is that Yorkville contends that that is a very narrow exception intended only for those who are purchasing property for their own residential use. So that's not a fact. No, I was going to say, Justice Burkett's one heck of a carpenter. If I bought the lot and hired him to build my house, he would have to finish it? He would have to finish the improvements because he's developing my property? Well, we're referring to the public improvements. Right. No, no, I understand. He would have to finish the streets? If I understand Your Honor's hypothetical, yes, that would be the case. Under the Yorkville interpretation, we maintain that that is an absurd result. Let's talk about the facts that are pled in this case as opposed to hypotheticals. TRG and William Ryan Homes are both developers. Correct. So that's uncontested, correct? That's correct. And isn't it a fact question as to what percentage of the improvements you'd be required to pay for if we interpret it according to the City of Yorkville and Fidelity? Yorkville's argument is that William Ryan and TRG would be responsible for all the public improvements, for the entire subdivision. We know that some of those public improvements have already been completed and Fidelity has settled with the City of Yorkville for a certain amount of money. I think it was $800,000 or some figure like that, correct? That's correct. What's at issue is the completion of the public improvements. Did TRG and William Ryan Homes go into this deal in the blind? Aren't they, as developers, familiar with the code and the requirement under the law that successive developers become responsible for public improvements? What they are aware of is the annexation agreement, Your Honor, and that annexation agreement set out what their obligations would be. If I can take a few moments. That's okay. I have another question for you. Go ahead. Certainly. But in entering into these purchases, both parties were not in the blind except insofar as what Yorkville might later interpret the annexation agreement to require. Both parties were under the impression, given what the annexation agreement says, that purchasers of empty lots were part of the exception in Paragraph 22B and would not be held to the obligations that Kimball Hill undertook when Kimball Hill owned the entirety of the property. In fact, many of the cases that Yorkville relies upon for the proposition  are cases in which the successor owner took on the entire obligations but was also taking on the entire property. That also goes to the other arguments, which time doesn't permit me to address in depth this morning, but the fact that the property that was acquired by each of the defendants before you today was not the property as it's defined in the annexation agreement. That's not unusual at all that properties that are intended or purchased by one developer get split up. That happens all the time. That's not unusual at all. Not at all. And the successive developers who purchase a section to develop become responsible for that percentage of their obligation under the annexation agreement, correct? Well, if we were referring, that's correct. But if we were referring to an obligation to a portion of the property, we would have a different argument before you this morning. The entire case would be different. What we're referring to and what we're arguing about is Yorkville's understanding, stated understanding that the obligations to complete the public improvements to the entirety of the subdivision have passed to successor owners of portions of the subdivision. And the Doyle case, which we cited, alludes to the fact that the municipal code does not make a specific provision for successors as to portions of the property or portions thereof to be obligated to the initial owner's obligations. The annexation agreement in this case does not limit that, the language of the exception in paragraph 22B to purchasers of the entirety of the land does not make provisions for purchasers of portions of the land. And that's in distinction to other portions of the very same paragraph, other subparts of that paragraph, which do carve out language that refers to purchasers of portions of the land. So given all of what the developers were aware of, it was a public record at the time that they purchased these properties, and what the annexation agreement provided and how it made those provisions, the understandings that we have set forth are perfectly reasonable ones that make that language in the exception ambiguous. And if it's ambiguous, it should be construed against the party who was part of the negotiation of that agreement, as opposed to those parties who were not part of that negotiation and could not have understood what Northville's differing interpretation was. I'd be happy to address any further questions. How does Doyle help your cause? Doyle clearly is different facts. We've never suggested that it is squarely on point. You interpret Doyle as meaning that no party in the bulk or otherwise who purchases less than an entire tract of land is subject to the annexation agreement. Well, what Doyle reflects in what the First District suggested there was that an interpretation of an agreement that would impose successor liability on those who purchased less than the entire property, and in that case it was purchasers of a single property, but the same rationale applies to anyone who purchases substantially less than the entire property. That would be an absurd result. That's the reason that Doyle is helpful to this Court. It doesn't decide an issue that is squarely relevant to this case. We haven't suggested that it does. My takeaway, just looking at Doyle, generally speaking stands for the proposition that successor owner of a single lot or home for a residence is different from an owner-developer. There's two different types of owners. Owners for residential occupation and owner-developers, correct? That's correct. And I think what Doyle recognizes is that the way in which they are different is only that the purchaser of the lot for his or her own residential occupation is likely purchasing only a single lot, whereas a developer may be purchasing the entire tract. But in a case like this one where the developers have purchased less than the entire tract and considerably less than the entire tract, I might add, the same rationale for not applying the entirety of the original owner's obligations to those purchasers applies just as well regardless of whether the purchaser has purchased a single lot or, in this case, 28% of the lots. Thank you. Thank you very much. Mr. Tuesley. Good morning. May I please support? My name is Adam Tuesley. I represent William Bryant Homes. And I want to start out just by saying that today and in the briefs and even in the pleadings, there is a mixture and a combination of continuing to group William Bryant Homes and TRG together. And there is significant differences in relation to the manner in which William Bryant Homes acquired its property and what TRG did, and even in timing. The facts, the timeline of this case as it pertains to William Bryant Homes is extremely bad for the appellants. If you look at this, to answer Justice Hutchinson's question as far as the single lot, the annexation agreement discusses a lot of responsibilities for the owners and the developers after that date. And so we're talking about here we're focusing solely on the overall public improvements not specific to a particular unit. However, you could buy a single lot and have to deal with the improvements for your individual lot. And so there would be a situation in which a single lot owner would have responsibilities under the annexation agreements if those improvements as to that lot were not done. To be agreed upon by the purchaser. Correct. And so in our case, we entered into this lot purchase agreement with Kimball Hill of which we were not required to buy any individual lot until those individual improvements were done. And in this case, they were. We paid William Bryant Homes to finish all of the individual improvements related to each lot. You paid William Bryant Homes? William Bryant Homes paid Kimball Hill. And so when we acquired our lots in 12 different transactions over the course of time, Kimball Hill was still performing under the annexation agreement. All of the public improvements were still being performed. By the time Kimball Hill filed bankruptcy, we had already acquired each of our individual lots in the subdivision and almost all of them had already been sold to third parties. So when we acquired our interests, the public improvements related to that individual lot were already done. The lot purchase agreement only required William Bryant Homes to do certain limited things. A couple of points about the lot purchase agreement. You raised this point later. It was not in your original response, correct? The lot purchase agreement? In the motion to dismiss? Yes. You know, we were raising this here today about it being a 2-6-15. It was a 2-6-19 motion that we filed originally. It is either a 2-6-15 or a 2-6-18 motion of property having to contest the truth of the factual allegation. It's not, is it? Well, in this particular case, and we say to the cases that say this, because they attached the deeds as to how we acquired it, but the deeds only came about because of the lot purchase agreement. So we used an affidavit to lay the foundation for the lot purchase agreement so it was properly before the court because it was exactly the mechanism for how those deeds came about. You say in your brief that Kimble Hill, according to the lot purchase agreement, expressly stated that the developer, Kimble Hill, retained the duty to complete the public improvements, not William Ryan Homes. That is correct. And then you cite a 15-page agreement. Correct. Can you direct me to the specific page and paragraph where that language is found? It's actually in the exhibits to the lot purchase agreement. So if you look at the lot purchase agreement, and specifically as to the Exhibit E and Exhibit D, Exhibit D is what the criteria for a permittable lot is. And so we only were required to buy lots if they became both permittable and permittable. Do you understand the difficulty in reading a brief where you cite 15 pages and make an accusation or an assertion like that? Where is it at now? It's Exhibit D and Exhibit E to the lot purchase agreement. What page of the common law record? I'm sorry. I've got it. Is it 2364? Yes, sir. It was okay. Can you contract away an obligation under a statute? In this particular case, yes, because in this particular case, they were continuing to still perform under the annexation agreement. They said even after we acquired all of our lots, the bonds were reduced because they were performing. So there is not a single case that's ever been cited that said that while a developer is still performing under the annexation agreement, they can't sell individual lots to a developer without also passing on that responsibility. They're basically viewing William Ryan Home as a guarantor. In the TRG cases, they acquired all of the interest that was remaining for the developer. We obtained individual discrete lots via 12 separate transactions. In any contiguous manner or just lot 1, lot 12, lot 14? Correct. And we identified those, how they were acquired. Sometimes it was lots 1 and 2 and then 18 through 21. They were not next to each other in any one of those transactions. But they were all for development. Correct. Not to be lived on by William Ryan Homes. Right. Let's get back to the business model. This is the business model. You go in, you pick up these lots at a decent price, you develop, and you sell the homes. Right. In this particular case, though, we paid specifically for those lots to have the improvements on them. And so all we were going to do was build the home. We weren't taking on the responsibility. And by the time that the default happened here, which was by the bankruptcy, we had very little interest left in the subdivision. And as Justice Burkett identified, there should be some sort of an apportionment of responsibility. Why would William Ryan Homes be responsible for all the rest of the development when the developer was still doing all of that work all the way up until the bankruptcy was filed? In 2008, if you look, William Ryan Homes had already sold almost all of those lots because they were still performing under the annexation agreement. So there's yet to be a case that's ever been cited. And even in the dicta of the Arch case, it identifies that it says unless the purchaser agrees otherwise. This agreement, the annexation agreement, also includes the same provision. There's nothing that says that a developer who's performing under an annexation agreement can sell individual lots to another developer and retain the development responsibilities. There is a case. There is not a single case been cited that said that what they did here was somehow wrong. What Kimball Hills and William Ryan Homes did was wrong. And that is allow the developer to continue to do the overall subdivision public improvements while selling individual improved lots to William Ryan Homes. Did TRG, I'm sorry, William Ryan Homes ever go to Yorkville and say this is what we're going to do or this is what we're doing? No, because we never heard anything because we knew. In order for us to sell these lots, title insurance, all these other things, we had to make sure that the individual lots had the sidewalk and had landscaping in front of it and all of that. So there would be no reason for us to ever deal with Yorkville. We knew the developer was performing. Well, you were familiar with the annexation agreement. Absolutely, but we knew the developer was still performing. Isn't there an obligation to go to the city? No. None at all? No. Even though section four of the code requires that successor developers take on the responsibility for public improvements? Well, in this particular case, it was those public improvement responsibilities were retained by Kimball Hill throughout the entire process. So why did I decide? As a matter of law, when they sell to another developer, that successor developer becomes responsible under the act. Right, but that, again, in this particular case, it says unless it's otherwise contract kept by the developer. I mean, even the exception provides that the developer can retain those responsibilities. We don't automatically come in and have responsibility for the whole thing because we bought discrete lots that already were actually improved by the developer. So that's what I mean. It's a slightly different analysis than what was at issue in the Arch case with TRG than what it is as it pertains to William Ryan Holmes, who bought just lots. They didn't buy the rights and the responsibilities or the development as a whole. We acquired them all well while they were still performing. Again, that's another critical fact from a timing perspective, is until the default, everything was going along the way, and so they're claiming William Ryan Holmes guaranteed the rest of the entire development somehow. And we don't know when that triggered. Was it triggered by the first purchase of 12? Was it purchased as soon as we hit 20? Was it hit 30? At what point did we become a developer all of a sudden? Well, you were a developer when you purchased the lots. So we bought them in 12 different transactions. It doesn't matter, does it? Does that really matter? Respond to the city's argument that the who in paragraph 22A refers to a purchaser who, meaning a person for residential occupation. So what I'm saying here, though, is I agree that a person who purchases an empty lot can be responsible for the public improvements as to their unit. And so there is the exception. The way that I'm reading it or that I'm suggesting that the court read it isn't making it completely, isn't looking in for some absurd result. What I'm saying here is if I buy an empty lot and then I plan on selling it to my cousin, okay, if that lot has no improvements on it, the developer hasn't done, the sewer hasn't done all of that, I have that responsibility under the agreement. Here they're then taking it to the next step of saying if you buy more than one, all of a sudden you're responsible for all of it. And that's not what that annexation agreement says, and that's not what the intent of any of these agreements would be. So counsel for both your fill and fidelity said that there still needed to be that third layer of the road. Right. On the properties that you purchased, that had been completed. Is that what you're saying? Well, it's not a matter of whether it had been completed. It was still, because these were in four separate phases, we bought some in one and some in two. You're talking about the improvements for the single lots, not the common usage areas, which would be the road surface and some other. Correct, all of the parks and all these other things that they're saying. You said there were sidewalks. Yes, sidewalks were our responsibility. So the sidewalks in front of our lot, on our lot, in the lot purchase agreement were our responsibility. All of those were done. Everything as it pertains, no one's ever claimed that William and Mary owns this lot. It strikes me that there's a lot of fact issues here that would need to be hashed out. If we were to agree with either side here, first of all, on the motion to dismiss, we cannot resolve, you agree, fact questions.  We can't. Right. So you're arguing that you should not be responsible, even if you are responsible under the annexation agreement, you should not be responsible for the whole. Correct. The allegation that somehow we took on responsibility for a whole is not a factual question. It's actually just looking at the language of the agreements between the parties to actually render that decision. So if those exhibits contradict the allegations, which, as we said, the court didn't have to take those allegations as true and find a question of fact. They can interpret those agreements and find the way they did, which in this case was to dismiss William and Mary Holmes from the case. Any other questions? Thank you. All right. Thank you. Good morning. Good morning. I wanted to touch upon a couple of things that were said, and I think there was an important admission that I did not see in the briefs. The counsel for TRG and for William and Mary Holmes admitted that they're a developer. And why that's important is because from your bill's perspective, this annexation agreement is really what controls this situation. And I want to focus on one thing. The issue before this appellate court is whether plaintiff properly pleaded a claim for breach of contract in declaratory judgment. And I think that we have. Most of today has been talking about a whole bunch of stuff that's outside the confines of the complaint. And I think, Justice, you focused on it. There are a whole bunch of fact issues here that need to be discovered and decided upon by a finder of fact. And, again, it's our position that that should happen, and we were denied that opportunity by the fact that this case was dismissed. And so what's important is that, Justice, you mentioned you can't advocate for an absurd result. And here this dismissal leads to an absurd result. The annexation agreement is there to protect the village of Yorkville and to protect the taxpayers of Yorkville and to protect the end users, the end residential purchasers of these homes. So who is supposed to provide in response for Yorkville agreeing to, okay, let's get this land. We'll bring it in. We'll make it part of our village. You have to do certain things in order to make that worth our while. If we're going to get these additional people that are now home buyers that are going to be part of our town, we need you to provide certain things, the sewer, the streets, the parks, the sidewalks, the detention ponds, all of that stuff. All of that is these improvements that need to be made. Getting back to the addition. And clearly the intention of that annexation agreement generally is once you do all of those things, it is your right to build some of that into your purchase price to the individual owner, correct? No question. And it's clear that that was not supposed to be Yorkville's responsibility and it was not supposed to be the end purchaser's responsibility. Who's in the middle? The developers. The original developer was Kimball. They go out of business. Who took on that role? Both William Ryan Holmes and TRG. But do you agree that William Ryan Holmes was in it before the downfall of Kimball? Yes, factually I think that that is accurate. But one thing that's not entirely accurate is not all of the improvements have been made even to date. So the fact that they say, well, some of them were made or they were made, you know, the ones that we were, that were important to us were made is really irrelevant. Were they all made? And so that's kind of the issue here. Looking at the annexation agreement and getting back to their admission that they're developers, here's the notices and remedy provision in 19. Nothing contained herein shall require the original named owners in this agreement, that's the people that own the farm field that sold to Kimball in the first place, to undertake any of the development obligations in this agreement. Those obligations being the responsibility of the developer of the property, originally Kimball, and slash or future owner slash developer of the property. I mean, it's very straightforward. That's the role that both William Ryan Homes and TRG decided to take on. To their point, the property of the developer, owner developer, should it not be limited to the percentage of the overall property? I think that that's a factual issue that has to be determined by the court. But you would agree, wouldn't you, that if a developer only purchases a portion of the planned development, he or she should only be responsible or it should be responsible only for that percentage of the property they acquire? I think that it would be appropriate for the court to make an appropriation as to who should be responsible for what, and it may take into factors like the timing of when the purchase occurred, how many homes in the entire development, et cetera. That may be very well appropriate. I don't think it's appropriate to discuss at the dismissal stage. It's whether or not there's a claim for any recovery, and if we've stated one for any recovery, then we should get beyond this dismissal. I think we have against each one. Likewise, couldn't this also have been accomplished by conversations between the developer, between, I won't use developer, between TRG and William Ryan Homes and Yorkville? Absolutely. And it's our position that that should have happened and it didn't happen. Their position is that according to their lot purchase agreement, they took these lots with the understanding that other improvements had been completed by Kimball Hill. Frankly, I think that's an absurd position to take. They could look around and see that the detention pond has not been finished yet, that the top layer of the street hasn't been done. Why would Fidelity have settled if it was all complete? I don't have personal knowledge as to why there was any, but often in settlements there can be many different factors that are involved. I think the point just being there can be more than one person responsible here for completing these improvements. I think there was certain responsibility from Kimball under the bankruptcy court, but there's certain responsibilities by both of TRG and William Ryan Homes under the responsibilities that they subsequently undertook, basically stepping into the role of developer. And I don't think that that's really an issue. Any other result here would be absurd, as Justice pointed out, because it will either stick Yorkville with that responsibility and or the residents who ultimately move in, and that's exactly what the annexation agreement was designed to prevent. It was to put this responsibility on the developer. These developers are not just buying one house. They're buying large lots. It's actually, I think, 295 homes, not 251 individual sites. It's not important for your determination, but ultimately they bought 29 and 24 percent of the entire development, 53 between the two. Arguing that we are not developers and we don't have these responsibilities is, again, I think it leads to an absurd result. Thank both parties for their arguments today. The matter will be taken under advisement. A written decision will be issued in due course. Thank you very much. The court stands in recess until the next case.